**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| | * |
| **ELLICOTT DREDGES, LLC,** | * |
| **Plaintiff** | * |
| **v.** | *  **CIVIL NO.  JKB-16-1328** |
| **DSC DREDGE, LLC** | * |
| **Defendant.** | * |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

<u>**MEMORANDUM**</u>

Plaintiff Ellicott Dredges, LLC has brought this action against Defendant DSC Dredge, LLC alleging that Defendant tortuously interfered with an exclusive sales representation contract Plaintiff had with a former Bangladeshi Ambassador, tortuously interfered with Plaintiff's business relations in Bangladesh, and competed unfairly.  (*See* Compl., ECF No. 1.)  Plaintiff moved for summary judgment on the tortious interference counts (ECF No. 60), and Defendant responded by moving for summary judgment on all counts (ECF No. 64).  Both parties have had opportunities to respond to these motions, and no hearing is necessary to resolve the matter.  *See* Local Rule 105.6 (D. Md. 2016).  For the reasons stated below, the Court will grant Defendant's motion, deny Plaintiff's motion, and dismiss the case by accompanying order.

**I.    *Facts***

Plaintiff and Defendant are competitors in the business of manufacturing and selling dredging equipment.  (Compl. ¶¶ 6, 16.)  Both parties operate around the world, including in Bangladesh, and both parties rely on Bangladeshi representatives to help them procure and maintain business in that country.   (*See id.* ¶¶ 6-8; DSC Dep. 28-29, 36, 42-43, Def.'s Mot.

Summ. J. Ex. 14, ECF No. 65-13.) This case revolves around one such representative, Bangladesh's former Ambassador to Brazil, Moin Ul Islam ("Amb. Islam").

In 2000, Plaintiff began working with Amb. Islam, and employed him as its exclusive sales representative in Bangladesh. (Compl. ¶ 7.) From 2000 to 2014, Amb. Islam operated in Bangladesh as Plaintiff's exclusive agent under various contracts. (Peter Bowe Dep. 37-38, Pl.'s Mot. Summ. J. Ex. 3, ECF No. 61-1.) Amb. Islam and Plaintiff signed a Sales Representation Agreement ("Representation Agreement") on January 16, 2014.[1] (Representation Agreement, Compl. Ex. A, ECF. No. 1-1.) This agreement was mutually exclusive, meaning that Plaintiff agreed not to make any sales representation agreement with anyone in Bangladesh besides Amb. Islam, and Amb. Islam agreed not to make "any agreement with others for the sale of products . . . which in any manner compete with [Plaintiff's] Products." (*Id.* § II.) This agreement automatically expired one year after it was signed, "unless [it was] extended by Agreement in writing between the parties before the end of the [year]." (*Id.* § XIX(A).)

Under the Representation Agreement and earlier contracts, Amb. Islam had been paid on a commission basis only, and in 2014 Amb. Islam expressed a desire to be paid on a more regular basis. (Paul Quinn Aff. ¶ 2, Pl.'s Mot. Summ. J. Ex. 1, ECF No. 60-2.) To satisfy this desire, Paul Quinn, Vice President of Sales for Plaintiff and Plaintiff's employee primarily responsible for dealing with Amb. Islam, arranged to provide Amb. Islam a retainer fee. (*Id.* ¶ 3.) Quinn emailed Amb. Islam on December 10, 2014 to "advise" him of a "new quarterly retainer payment." (*Id.* Ex. B, Pl.'s Mot. Summ. J. Ex. 1-B, ECF No. 60-4.) In this email, Quinn informed Amb. Islam that, beginning on January 1, 2015, Plaintiff would pay Amb. Islam a certain amount of money on a quarterly basis. (*Id.*) Quinn also explained that "[a]t the end of

---

[1] Plaintiff's representative signed this document on January 10, 2014, and Amb. Islam signed it six days later on January 16.

2015, we will re-examine this for 2016." (*Id.*) This email did not discuss whether Amb. Islam had any additional duties as a result of this new retainer payment. For example, the email did not request that Amb. Islam continue to exclusively represent Plaintiff in order to earn this retainer. Instead, Quinn explained that "[n]one of this affect[s] your current Representation Agreement with us." (*Id.*). Plaintiff refers to this email as a "Retainer Agreement."

Aside from the Retainer Agreement, there was no other written agreement prior to January 16, 2015 that referenced the Representation Agreement, let alone one that memorialized a desire to extend it past that date. Nevertheless, throughout 2015 Plaintiff continued to pay Amb. Islam commission in accordance with the Representation Agreement. (Compl. ¶ 13.) Amb. Islam, for his part, continued to work with Plaintiff, hosting Plaintiff's employees when they visited Bangladesh, introducing Plaintiff to potential clients, and even stating in an email to a client that he was Plaintiff's "exclusive rep" in Bangladesh. (*See* Quinn Aff. ¶¶ 8, 11; Peter Bowe Aff. Ex. B, Pl.'s Opp'n Ex. 23-B, ECF No. 69-4.) But Amb. Islam did not continue to work for Plaintiff without complaint. In early September 2015, Amb. Islam sent a letter to Plaintiff expressing displeasure with the way in which he had been treated by Quinn on a recent trip to Bangladesh. (6/14/15 Ambassador Islam to Paul Quinn Email, Pl.'s Mot. Summ. J. Ex 4, ECF No. 61-2.)

Perhaps due to this displeasure, Amb. Islam had begun working with Defendant. In June 2015, Charles Sinunu, director of international dredge sales for Defendant, emailed various potential clients in Bangladesh and noted that Amb. Islam had introduced Defendant to those clients. (*See* Pl.'s Mot. Summ. J. Exs. 6-7, ECF Nos. 60-9, 61-4.) Importantly, as early as August 2015, Amb. Islam appeared to have been involved in Defendant's relationship with a particular shipyard and potential client, known as Karnafuly. (*See* 8/27/15 Emails with Charles

Sinunu and Ambassador Islam re: Karnaphuli travel, Pl.'s Mot. Summ. J. Ex. 9, ECF No. 60-12.)[2]  According to the Defendant, Amb. Islam had approached Defendant representing himself as an agent of these various potential clients.  (*See* DSC Deposition at 90.)  Also according to Defendant, Amb. Islam had said he had no relationship with Plaintiff, explaining that his agreement with Plaintiff had expired at the end of 2014.  (*Id.* at 55, 69.)  Defendant had asked for proof that Amb. Islam was not working for Plaintiff when he initially contacted Defendant in the summer of 2015.  (*Id.*)  Amb. Islam had responded via phone call and email affirming that he was no longer a representative of Plaintiff.  (*Id.* at 55.)

During these communications between Amb. Islam and Defendant, Plaintiff still believed that Amb. Islam was acting as its exclusive agent in Bangladesh.  In early September 2015, Plaintiff's employee Peter Bowe contacted Defendant's employee Robert Wetta to "check in to [Sinunu] chasing [Plaintiff's] rep in Bangladesh."  (9/3/15 Email between Rob Wetta and Charles Sinunu, Pl.'s Mot. Summ. J. Ex. 16, ECF No. 60-19.)  Wetta in turn contacted Sinunu, asking him to "[c]onfirm with [Amb. Islam] if he does have a valid agreement in place or if Peter [Bowe] is just fishing."  (*Id.*)  In addition to asking Amb. Islam whether he had a valid agreement with Plaintiff, which Amb. Islam denied, Defendant's employees also asked for proof from Plaintiff that Amb. Islam was under contract.  (*See* DSC Deposition at 69-70; 9/3/15 Peter Bowe's Email to Rob Wetta, Pl.'s Mot. Summ. J. Ex. 17, ECF No. 61-11.)  Plaintiff responded to this request for proof by providing Defendant an email correspondence with Amb. Islam from August 2015 regarding a potential visit to one of Plaintiff's facilities, as well as the email containing the "Retainer Agreement."  (*See* 9/4/15 Peter Bowe's Email to Rob Wetta, Pl.'s Mot.

---

[2] The parties' exhibits use the alternative spellings of "Karnaphuli" and "Karnafuly" interchangeably, but the parties are consistent with the use of "Karnafuly" in their motions and memoranda.  Therefore, the Court will use the spelling "Karnafuly," except when "Karnaphuli" is used in the title of an exhibit.

Summ. J. Ex. 18, ECF No. 61-12.)  Plaintiff also told Defendant that it was still paying Amb. Islam.  (*Id.*)

Defendant did not view Plaintiff's response as "proof" of a formal agreement between Plaintiff and Amb. Islam, and Defendant continued to communicate with Amb. Islam for the remainder of 2015.  Defendant did not, however, pay Amb. Islam commission fees in 2015, nor is there any evidence that Defendant asked Amb. Islam to cease working for Plaintiff, to provide Defendant with proprietary information belonging to Plaintiff, or to direct potential clients for Plaintiff to do business with Defendant.  In December of 2015, Defendant and Karnafuly signed a Memorandum of Understanding stating that Defendant would provide Karnafuly a machinery package resulting in almost $1,000,000 in business for Defendant.  (*See* 12/6/15 Karnaphuli Memorandum of Understanding, Pl.'s Mot. Summ. J. Ex. 12, ECF No. 61-7; Karnaphuli Pro Forma Invoices, Pl.'s Mot. Summ. J. Ex. 13, ECF No. 61-8.)

In January 2016, Amb. Islam sent a letter (via email) to Plaintiff.  (1/29/16 Ambassador Islam and Peter Bowe Email, Pl.'s Mot. Summ. J. Ex. 19, ECF No. 61-13.)  In this letter, Amb. Islam stated that the "Agreement" (presumably referring to the Representation Agreement) "automatically ended" on January 9, 2015,[3] and had not been extended.  (*Id.*)  Amb. Islam

---

[3] In this letter, Amb. Islam appears to have used a Bangladeshi dating convention of day-month-year, writing that the agreement expired on "09.01.2015," instead of the United States convention of month-day-year, as in 01.09.2015.  *See, e.g.*, Extraordinary Gazette of December 2017, Bangladesh Government Press, *available at* http://www.dpp.gov.bd/bgpress/index.php/document/get_extraordinary/23927 (last visited Dec. 4, 2017) (displaying date of Bangladeshi legislative document in day-month-year format).  Plaintiff interpreted Amb. Islam's foreign dating convention differently, alleging in its complaint that Amb. Islam confirmed "that in his opinion he had a contract with Ellicott through September 1, 2015."  (Compl. ¶ 15.)  Nowhere else besides Plaintiff's complaint does it try to make the argument that Amb. Islam was under some contract that expired on September 1, 2015, and for good reason.  The context of Amb. Islam's January 29, 2016 email makes Plaintiff's reading of that date highly implausible.  The email states: "[T]he Agreement between myself and [Plaintiff] has automatically ended on the expiry [sic] of one year from the date of signature i.e. 09.01.2015, as the same has not been extended by further Agreement."  (1/29/16 Ambassador Islam and Peter Bowe Email.)  No agreement between Plaintiff and Amb. Islam was signed on September 1, 2014.  The Representation Agreement, by its own terms, automatically expired one year from the date of signature, and that agreement was signed by Plaintiff's representative on 01.10.2015.  That Amb. Islam was referring to the Representation Agreement in the January 29, 2016 email, and that Amb. Islam believed it had expired on January 9, 2015, and was using a Bangladeshi dating convention, makes abundant sense.  That Amb.

further stated that he had clearly informed Plaintiff that he was not "comfortable about the way [he] was dealt with during the tenure of the past Agreements." (*Id.*) Amb. Islam then explained that he had "stopped representing [Plaintiff] in Bangladesh" and that he "will no longer be associated with [Plaintiff]." (*Id.*)

In February 2016, Amb. Islam signed a formal agreement to represent Defendant. (DSC Sales Representation Agreement with Ambassador Islam, Pl.'s Mot. Summ. J. Ex. 20, ECF No. 61-14.) Several months later, in May 2016 Plaintiff brought this lawsuit, alleging three causes of action: tortious interference with contractual relations, tortious interference with prospective relations, and unfair competition. (Compl. ¶¶ 23-45.) Both parties filed motions for summary judgment.

## II.     *Standard of Review*

"When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003). The Court will grant summary judgment to a party who demonstrates that (1) there is no genuine dispute as to any material fact and (2) that party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing predecessor to current Rule 56(a)). If sufficient evidence exists for a reasonable jury to render a verdict in favor of the party opposing the motion, then a genuine dispute of material fact is presented and summary judgment should be denied. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, a "mere existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to defeat a motion for summary judgment. *Id.* at 252. The facts themselves, and the inferences to be drawn from the underlying facts, must be viewed in the light

---

Islam was referring to some other agreement and that Amb. Islam believed that agreement or the Representation Agreement expired on September 1, 2015 makes none.

most favorable to the opposing party. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008).

**III.**    *Analysis*

Plaintiff has brought three counts in its complaint – tortious interference with contractual relations, tortious interference with prospective relations, and unfair competition – and the Defendant has moved for summary judgment on all counts. Viewing all facts and inferences in the Plaintiff's favor, the Court finds that Defendant has met its burden under Rule 56 and will grant Defendant's motion for summary judgment for the reasons explained below. Accordingly, Plaintiff's motion will be denied. The Court will discuss each of the three counts in Plaintiff's complaint in turn.

**a.** ***Tortious Interference with Contract***

Tortious interference with contract is a recognized cause of action in Maryland, and it has five elements: "(1) existence of a contract between plaintiff and a third party; (2) defendant's knowledge of that contract; (3) defendant's intentional interference with that contract; (4) breach of that contract by the third party; and (5) resulting damages to the plaintiff." *Fowler v. Printers II, Inc.*, 598 A.2d 794, 802 (Md. Ct. Spec. App. 1991).

Plaintiff's case for interference with contract fails on the first element because the Representation Agreement expired on January 16, 2015. By its explicit terms, the Representation Agreement expired one year after it was signed, on January 16, 2014, unless it was extended "by Agreement in writing between the parties before the end of the period." Plaintiff has put forth no writing that extends this agreement. To the extent that Plaintiff believes the Retainer Agreement was a writing that extended the Representation Agreement, that contention is belied by both the terms of the Retainer Agreement and Plaintiff's own statements.

The Retainer Agreement nowhere states that it serves as a written confirmation of extension of the Representation Agreement, and in fact states the opposite, i.e. that "[n]one of this [Retainer Agreement] affect[s] [Amb. Islam's] current Representation Agreement with [Plaintiff]." (Quinn Aff. Ex. B.)  Furthermore, Plaintiff explained that the email containing the Retainer Agreement was "*solely* to address Amb. Islam's concern that his commission payments might be offset in whole or in part by the new retainer payments."  (Pl.'s Mot. Summ. J. Mem. Supp. 6-7, ECF No. 60-1 (emphasis added).)  And Plaintiff wrote in its complaint that the "2015 Retainer Agreement did not affect the Contract between the parties which still remained in full force," presumably referring to the Representation Agreement.  (Compl. ¶ 12.)  No other writing has been presented by either party that could possibly serve as an agreement to extend the 2014 Representation Agreement.  Therefore, by its own clear terms it expired on January 16, 2015.

In lieu of a writing that confirms the continuation of the Representation Agreement, Plaintiff contends that the actions of the parties should serve as such confirmation.  Plaintiff contends that "Amb. Islam and [Plaintiff] both operated under the Sales Representation Agreement for the duration of 2015, and their conduct is completely consistent with that fact." (Pl.'s Mot. Summ. J. Mem. Supp. at 17.)  Even if the parties' performance of contractual obligations alone would be sufficient evidence to establish a valid contract – and the Court does not so hold – it is axiomatic to Plaintiff's lawsuit that Amb. Islam's conduct *was not* "completely consistent" with an understanding that the Representation Agreement was in effect.  Rather, Plaintiff's lawsuit rests on the allegation that Amb. Islam acted as Defendant's representative in Bangladesh in 2015; conduct that was "completely consistent" with an understanding that the Representation Agreement had expired.

To reinforce its argument that Amb. Islam believed otherwise, Plaintiff presents an email Amb. Islam wrote to a customer in Bangladesh in June 2015 and in which he stated that he was the "exclusive rep for [Plaintiff]." (Bowe Aff. Ex. B.) Although Plaintiff contends that this is a "most important[]" statement by Amb. Islam, the Court does not find it so compelling. (*See* Pl.'s Opp'n 16, ECF No. 68.) If this were a statement to Plaintiff or Defendant in response to queries from either as to Amb. Islam's contractual obligations, it would carry more weight with the Court. But it was not; it was an introductory statement to a Bangladeshi customer, likely intended by Amb. Islam to establish himself as the Plaintiff's Bangladeshi point of contact for this new customer. This email may be persuasive evidence in a suit against Amb. Islam for misrepresentation, but that is not the case before the Court.[4] The bottom line is that the clear terms of the 2014 Representation Agreement envisioned its expiration on January 16, 2015 unless there was a written agreement extending it. There was no such written agreement, and therefore there was no valid contract precluding Amb. Islam from representing other dredging companies in 2015, and therefore no contract for Defendant to interfere with.

The lack of a genuine dispute of material fact with regard to the existence of an exclusive representation contract is enough to deny Plaintiff's motion for summary judgment, and grant Defendant's motion on this count. Briefly, however, the Court will note that even if it found a genuine dispute of material fact as to this first element, the evidence further demonstrates the lack of a genuine dispute with regard to, at least, the second and third elements, i.e. that Defendant knew of an exclusive contract, and that Defendant intentionally and wrongfully

---

[4] Plaintiff generally seems to confuse Amb. Islam's alleged impropriety with that of the Defendant. For example, Defendant asserts that it believed Amb. Islam was working as a representative for various clients (and not the Plaintiff) when he contacted Defendant in 2015. As evidence that Defendant did not believe this, Plaintiff points to an affidavit from Karnafuly in which Karnafuly asserts that Amb. Islam never worked as its representative in 2015. (*See* Pl.'s Opp'n at 18 (citing Rashid Aff., Pl.'s Opp'n Ex. 24, ECF No. 69-5).) Though this may be evidence that Amb. Islam misrepresented himself to Defendant, it is not evidence that Defendant knew Amb. Islam was not working for Karnafuly (or other potential customers) in 2015.

interfered with it. Amb. Islam represented to Defendant that he had no exclusive contract with Plaintiff. If that was untrue, Plaintiff may have a legitimate grievance against Amb. Islam, but Amb. Islam's representations would nevertheless serve to demonstrate *Defendant's* lack of knowledge of an exclusive contract. *See EndoSurg Medical, Inc. v. EndoMaster Medical, Inc.*, 71 F. Supp. 3d 525, 542-43 (D. Md. 2014) (finding that plaintiffs tortious interference with employment contract claim failed because there was no valid non-compete contract, but also because the defendant "only hired [the] former . . . employees after confirming with the employees that they did not have non-compete agreements."). Furthermore, Defendant asked Plaintiff for proof that Amb. Islam was under an exclusive contract, and the only proof that Plaintiff sent was the 2014 Representation Agreement, the Retainer Agreement email, and an email from Amb. Islam demonstrating that he was still doing business on behalf of Plaintiff. At the very most this is enough to cause a competitor to suspect that Amb. Islam might be in some way engaged with Plaintiff. It is not "proof" that would necessarily overcome Amb. Islam's own assurances.

Finally, as to the third element of intentional interference with the contract, there must be intentional, wrongful action to cause a breach of the contract. *See Sharrow v. State Farm Mut. Auto. Ins. Co.*, 511 A.2d 492, 497-98 (Md. 1986). In other words, even if Amb. Islam breached a contract between himself and Plaintiff, and even if Defendant benefited from that breach, that alone would not be sufficient to find Defendant liable for tortious interference with contractual relations. In fact, even if Defendant had intentionally induced Amb. Islam to breach the contract, *that* alone would not necessarily make Defendant liable under this tort. *See id.* at 498 ("[E]ven though a third party may for his own benefit intentionally induce one party to terminate a contract with another, this alone will not render him liable in an action for tortious interference if

he had a right to cause the breach since, in such circumstances, the conduct would not be wrongful or improper.")  Even if the Court determined there was enough evidence for a jury to find the existence of a contract and Defendant's knowledge of that contract – and it does not – there is simply no evidence on the record before the Court that Defendant did anything more than (at worst) take advantage of a disaffected employee of its competitor knowing that the employee was in breach of a contract.  There is no evidence, for example, that Defendant ever requested that Amb. Islam cease working for Plaintiff, caused Amb. Islam to direct customers to Defendant *instead* of Plaintiff, lied to Plaintiff, or lied to customers about Amb. Islam's relationship to Plaintiff or Defendant.  There is no genuine dispute of material fact as to whether Defendant acted intentionally with the aim of interfering with a contract between Plaintiff and a third party; it did not.  For this reason, and because the Court finds no genuine dispute as to the existence of a contract or Defendant's knowledge of it, Plaintiff's motion for summary judgment will be denied as to count one and Defendant's motion will be granted.

### b. *Tortious Interference with Prospective Relations*

Beyond tortious interference with a specific contract, Maryland recognizes a more general tort of interference with business relations, *see Alexander & Alexander Inc. v. B. Dixon Evander & Assocs., Inc.*, 650 A.2d 260, 268 (Md. 1994), and Plaintiff has alleged such tortious interference in its second count.  This tort has four elements:  "'(1) intentional and wilful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting.'" *Id.* at 269 (quoting from *Willner v. Silverman*, 71 A. 962, 964 (Md. 1909)).  In Plaintiff's complaint, it alleges that Defendant tortuously interfered with Plaintiff's business relations with "Orion and

Other Customers." (Compl. at 7.) In its motion for summary judgment and supporting memorandum, Plaintiff nowhere mentions "Orion." Considering its motion and memorandum, it appears to the Court that Plaintiff's claim is that Defendant interfered with Plaintiff's business relationship with Karnafuly Shipyard. Specifically, Plaintiff claims that Defendant's sale to Karnafuly of a machinery package worth nearly $1,000,000 was a direct result of Defendant's interference with Plaintiff's relationship with Karnafuly.

Plaintiff has failed to present a genuine dispute of material fact with regard to (at least) the elements of intent and causation (i.e. elements one and two). That is, even if Plaintiff has presented enough evidence from which a jury could infer that Karnafuly was actively considering Plaintiff for the machinery package contract that was ultimately worth $1,000,000 (which is questionable), it has not presented sufficient evidence from which a jury could infer that Defendant acted intentionally to prevent Plaintiff from receiving that contract. Plaintiff seems to blend its tortious interference with contract claim with its tortious interference with business relations claim. Plaintiff argues that Defendant knew Amb. Islam was in an exclusive contract with Plaintiff, nevertheless did business with Amb. Islam, and received the Karnafuly contract as a result. According to Plaintiff, Defendant must therefore be liable for interference with Plaintiff's prospective business relation. That is not the law. Even if Plaintiff had presented sufficient evidence to survive summary judgment on the contract claim, that would not ineluctably lead to a conclusion that Defendant tortuously interfered with Plaintiff's prospective relation. Plaintiff must produce some evidence that Defendant actively worked to undermine Plaintiff's relationship with Karnafuly, and did not simply benefit from a sale arranged by Amb. Islam. No such evidence is before the Court, and therefore Plaintiff's motion for summary judgment will be denied as to count two, and Defendant's motion will be granted.

### c. *Unfair Competition*

Maryland recognizes the tort of unfair competition and defines it as "damaging or jeopardizing another's business by fraud, deceit, trickery or unfair methods of any sort." *Trimed, Inc. v. Sherwood Med. Co.*, 977 F.2d 885, 891 (4th Cir. 1992) (quoting *Baltimore Bedding Corp. v. Moses*, 34 A.2d 338, 342 (Md. 1943)). Though this tort is susceptible to a broad interpretation, "[t]he courts must be careful to guard against extending the meaning of 'unfair competition' to cover acts which may be unethical yet not illegal." *Edmondson Village Theatre v. Einbinder*, 116 A.2d 377, 382 (Md. 1955). Therefore, only acts which "substantially interfere[] with the ability of others to compete on the merits of their products" or acts that "conflict[] with accepted principles of public policy" can serve as the grounds of an unfair competition claim. *Sprint Nextel Corp. v. Simple Cell Inc.*, 248 F. Supp. 3d 663, 687 (D. Md. 2017) (quoting *Paccar Inc. v. Elliot Wilson Capitol Trucks LLC*, 905 F. Supp. 2d 675, 692-93 (D. Md. 2012)). This is in part why "[a]llegations of fraud and deception commonly underlie claims of unfair competition, although they are not strictly required." *Id.*

The Court will grant Defendant's motion for summary judgment on this Count for reasons already explained above. The Court has found that there is no genuine dispute of material fact in regard to the following: (1) there was no exclusive contract between Plaintiff and Amb. Islam in effect in 2015, (2) to the extent that Amb. Islam was somehow prohibited from working with Defendant in 2015, Defendant was unaware of that fact, and (3) Defendant did not act intentionally to interfere with Amb. Islam's relationship with Plaintiff, or Plaintiff's relationship with any customer. These three findings establish that Defendant did not act in any legally unfair, i.e. deceitful, fraudulent, duplicitous, misleading, etc., manner. There is no evidence that Defendant lied to any customer, lied to Plaintiff, or misrepresented to anyone the

relationship that it had with Amb. Islam, or the relationship that Amb. Islam had to Plaintiff. Perhaps it was not the height of ethical behavior for Defendant to accept business directed its way by Amb. Islam if it suspected that Amb. Islam was in violation of a contract with Plaintiff. Perhaps there are other ways in which Defendant behaved unethically (the Court does not so find). Regardless, the Court's job here is to determine if there is a genuine dispute as to whether Defendant behaved *illegally*, not unethically, and it finds there is none. Accordingly, Defendant's motion for summary judgment on count three will be granted.

**IV.** *Conclusion*

The Court finds that there is no genuine dispute of material fact with regard to all counts in Plaintiff's complaint and that Defendant is entitled to judgment as a matter of law. Therefore, the Court will grant Defendant's motion for summary judgment, deny Plaintiff's motion for summary judgment, and dismiss the case by accompanying order.

DATED this 4th day of December, 2017

BY THE COURT:

_____/s/_____
James K. Bredar
Chief Judge